<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

_____
:
MURRAY SALKOVITZ,                             :
     Plaintiff,                                  :     Civ. No. 04-344 (GEB)
:
     v.                                          :
:
PIONEER ELECTRONICS (USA), INC.,              :     **MEMORANDUM OPINION**
     Defendant.                                  :
_____:

**<u>BROWN, District Judge</u>**

     This matter comes before the Court upon Defendant Pioneer Electronics, Inc.'s ("Pioneer") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). The Court decided the motion based on the parties' written submissions and without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons discussed below, Pioneer's motion is granted.

**I.    BACKGROUND**

     Pioneer is engaged in the business of manufacturing, distributing, and selling consumer and commercial electronic products. In 1990, Plaintiff Murray Salkovitz ("Plaintiff") began working for Pioneer as a Regional Sales Manager in the Home Entertaining Company ("HEC"), one of Pioneer's business divisions. Before April 2003, the HEC was divided into five zones which covered various geographic regions. Each zone had a Zone Director who was responsible for "managing all aspects of the Zone's daily business, ensuring that the Zone met its sales quota, negotiating the sale and promotion of home electronic products with Pioneer's customers, analyzing and tracking sales, managing the Zone's personnel, and performing various administrative duties." (Def.'s 56.1

Statement ("Def.'s Stmt."), ¶ 6).

Plaintiff became HEC Regional Director on March 29, 1999, and was later given the title of Zone Director on July 2, 2000. (*Id.*, ¶ 3). He was fifty-five years old at the time. Plaintiff first reported to Peter Brown ("Brown"), then to Frank Kendzora ("Kendzora") beginning in December 2001. Of the five Zone Directors, both regarded Plaintiff as the weakest performer. (*Id.*, ¶ 7). In his first performance evaluation by Brown which covered April 1, 2000 to March 31, 2001, Plaintiff's performance was rated "below standard." (Certification of Ilan E. Simon ("Simon Cert."), Ex. F). He received the second lowest possible rating, i.e., "Meets Some Expectations." (*Id.*). The following year, Kendzora was responsible for evaluating Plaintiff's performance. At that time, Kendzora worked with Plaintiff for a period of two months. Plaintiff received the middle rating of "Meets Expectations." (*Id.*, Ex. G). After supervising Plaintiff for a full year, Kendzora continued to consider Plaintiff the weakest in terms of performance when compared to the other Zone Directors. (Def.'s Stmt., ¶ 12).

The performance evaluations of the other Zone Directors supported Brown and Kendzora's opinion of Plaintiff. For example, Suzanne Palermo ("Palermo") (Zone 1 Director), Kevin Doyle ("Doyle") (Zone 2 Director), William Haymond ("Haymond") (Zone 3 Director), received either "Exceeds Some Expectations" or "Exceeds Expectations," the two highest available ratings, in their performance evaluations of 2001 and 2002. (*Id.*, ¶ 13). Stephen Ferreira, Director for Zone 4, received a higher rating than Plaintiff in 2001, and received the same rating in 2002. (*Id.*).

Tsutomu Haga ("Haga") became President of HEC in July 2001. At that time, HEC was the least profitable business division at Pioneer. In December 2001, Kendzora became Vice President of Field Sales. One of the first assignments given to Kendzora by Haga was to develop a

2

reorganization plan to make HEC profitable. This involved lowering operation costs and increasing sales and revenue. (*Id.*, ¶ 17). Developing the plan occurred throughout most of 2002, and was finalized in February 2003.

During the development of the reorganization plan, Haga met with each of the five Zone Directors to evaluate the strengths and weaknesses of each manager, and of the division as a whole. Haga asked each director how HEC could be more profitable, and what contributions the director could make in order to achieve this objective. (*Id.*, ¶ 19). Plaintiff's answers did not impress Haga, and Plaintiff was perceived as a weak director with poor business strategies and little knowledge of new technology.

A market analysis of the five zones was conducted. It was determined that the two East Coast zones, Zone 4 and 5, were performing below standard. The analysis indicated that a weak sales force, poor retention of existing customers, and the lack of new customers were primary reasons that these zones were underperforming. In addition, Haga conducted site visits with numerous customers to evaluate their needs and to get feedback regarding Pioneer's performance.

Based on the information Haga gathered, he concluded that the division required restructuring to increase profitability. Kendzora originally suggested decreasing the number of zones from five to three. Finding this to be too drastic, Haga opted to reduce the number of zones to four. A new Zone Director position was created for the newly expanded zone. (*Id.*, ¶ 18). Additional changes that were implemented as part of the reorganization included the elimination of the following positions: 1) national account manager, 2) district sales manager (two positions), and 3) regional administrative assistant. (*Id.*, ¶ 29). The position of New Accounts Development was created which focused exclusively on the development of new customers.

The newly expanded zone covered the greatest geographic territory and had the largest business volume of all HEC Zones. The zone also included one of Pioneer's key accounts, Tweeter, which was Pioneer's "second largest independent high end customer." (*Id.*, ¶ 32). Based on Plaintiff's past performance, Kendzora did not recommend Plaintiff for the position of director for this new zone. Rather, Kendzora recommended Peter Arnold ("Arnold") who held the position of Key Account Manager. This position lies in the middle of District Sales Manager and Zone Director, and entails similar responsibilities to that of a Zone Director. Arnold had considerable success in managing Ultimate Electronics, one of Pioneer's Elite brand accounts. Haga believed that Arnold performed well in his position, and agreed with Kendzora's recommendation to appoint Arnold as the new Zone Director. Arnold was thirty-five years old at the time.

On March 31, 2003, Plaintiff was informed that his employment with Pioneer would end. Kendzora further informed Plaintiff that he would stay on as a consultant until October 1, 2003. (*Id.*, ¶ 42). Until then, Plaintiff received his full salary and benefits. In this position, Plaintiff was expected to come in once or twice a week to assist Arnold with any problems that may arise during the transition. Plaintiff was permitted to use the remainder of the week for personal matters, including looking for a new job. Because Plaintiff remained on the payroll until October, Plaintiff was entitled to a full bonus for the first part of the 2004 fiscal year. Plaintiff did not inform Pioneer that he believed age was a factor of his termination before his employment ended.

On December 8, 2003, Plaintiff filed suit in the Superior Court of New Jersey, Monmouth County, alleging unlawful termination of employment based on age in violation of New Jersey Law Against Discrimination ("NJLAD"). On January 27, 2004, Pioneer removed the matter pursuant to 28 U.S.C. §§ 1441(a) and 1446(b) based on diversity jurisdiction. Plaintiff filed the instant motion

for summary judgment on January 27, 2005.

**II.    DISCUSSION**

    **A.    Summary Judgment Standard**

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987).

    Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED. R. CIV. P. 56(e). The rule does not increase or decrease a party's ultimate burden of proof on a claim. Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 255-56.

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the nonmoving party has provided evidence to show that a question of material fact remains. *See Celotex,* 477 U.S. at 324. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented . . . by depositions, answers to interrogatories, or further affidavits," *id.* at 322, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Anderson*, 477 U.S. at 247-48 ("By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion . . . the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); *Anderson*, 477 U.S. at 249; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact . . . the [non- moving party] need not match, item for item, each piece

6

of evidence proffered by the movant" but rather must exceed the 'mere scintilla' threshold.), *cert. denied*, 507 U.S. 912 (1993).

### B. Plaintiff's NLJAD Claim

Plaintiff brings his age discrimination claim under the New Jersey Law Against Discrimination ("NJLAD"). The Supreme Court of New Jersey articulated that the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework serves as a starting point for analyzing such claims. *Monaco v. Am. Gen. Assurance, Co.*, 359 F.3d 296, 300 (3d Cir. 2004) (citing *Commercial Bank v. Sisler*, 723 A.2d 944, 955 (N.J. 1999)). The framework consists of three steps. First, the plaintiff must present sufficient evidence to support a prima facie case of discrimination. *Hicks*, 509 U.S. at 506; *Keller*, 130 F.3d at 1108. Once plaintiff establishes a prima facie case, the burden of production then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for their actions. *Burdine*, 450 U.S. at 254; *Hicks*, 509 U.S. at 506-07. If the defendant satisfies this burden, the court must proceed to the third step. At this stage, the burden of production shifts back to the plaintiff who must come forward with admissible evidence showing that the defendant's articulated nondiscriminatory reasons were not the true reasons for the adverse action, but merely a "pretext for discrimination." *Hicks*, 509 U.S. at 507-08; *McDonnell Douglas*, 411 U.S. at 802. Although the evidentiary burdens shift between the plaintiff and the defendant, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

Here, the parties dispute the last two steps of the burden-shifting framework.[1]

### 1.  Legitimate, Nondiscriminatory Reason

At this stage, Pioneer must come forward with admissible evidence which supports the nondiscriminatory reason or reasons for its actions. *Burdine*, 450 U.S. at 255. Defendant's burden is "rather light." *Monaco*, 359 F.3d at 300. The New Jersey Supreme Court noted that "[t]he resulting burden has been described as so light as to be 'little more than a mechanical formality; a defendant, unless silent, will almost always prevail.'" *Mogull v. CB Commercial Real Estate Group, Inc.*, 744 A.2d 1186, 1197-98 (N.J. 2000) (citation omitted).

Here, Pioneer asserts that Plaintiff was terminated as part of the reorganization of HEC. The reorganization combined Zones 4 and 5, which resulted in only one position of Zone Director for the newly expanded zone. Pioneer asserts that Plaintiff was not selected for this position because he was not the most qualified individual. The evidence of the record indicates that Plaintiff received the lowest performance evaluations of all the Zone Directors, and exhibited substandard leadership skills. Pioneer ultimately chose Arnold for the position based on his strong leadership skills and success in his role as Key Account Manager. Pioneer contends that Arnold was significantly more qualified than Plaintiff. (Def.'s Br. at 22-23). The Court concludes that this reason clearly constitutes a legitimate, nondiscriminatory reason for termination. *See Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1220 (3d Cir. 1988) ("[b]arring any attempt to hide discrimination, the [c]ompany has the right to make business judgments on employee status, particularly when the

---

[1] In this motion, the parties do not contest whether Plaintiff established a prima facie case of discrimination. However, Pioneer reserved the right to challenge this issue at trial should the Court deny summary judgment. (Def.'s Br. at 21 n.5).

decision involves subjective factors such as creativity and initiative").

Accordingly, the Court concludes that Pioneer has satisfied its burden of demonstrating a legitimate, nondiscriminatory reason for Plaintiff's termination.

### 2. Pretext

Since Pioneer satisfied its burden of the *McDonnell Douglas* framework, Plaintiff now bears the burden of identifying evidence that demonstrates Pioneer's reason is a pretext for discrimination. To create a factual dispute as to pretext, the plaintiff must bring forth direct or circumstantial evidence that casts doubt on the defendant's proffered nondiscriminatory reasons. *See Chauhan*, 897 F.2d at 127 (quoting *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1220 (3d Cir. 1988), *cert. denied*, 490 U.S. 1098 (1989)). In *Fuentes v. Perskie,* 32 F.3d 759 (3d Cir. 1994), the Third Circuit articulated that the plaintiff must adduce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764; *see also Keller,* 130 F.3d at 1108.

With regard to the first prong, a plaintiff may discredit the employer's proffered legitimate, nondiscriminatory reason in the following manner:

> To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.

*Keller,* 130 F.3d at 1108-09 (quoting *Fuentes,* 32 F.3d at 765). It is not the court's role to evaluate whether the employer's decision to discharge the employee was a sound business decision. Rather, the court's focus must remain on whether the actual reason for discharge was discrimination. *Id.* at 1109. In order to prove the second prong, the plaintiff must identify evidence in the record that would permit a factfinder to draw an inference that discriminatory intent more likely than not caused the termination. The plaintiff may attempt to prove age discrimination solely by "the natural probative force of the evidence." *Keller,* 130 F.3d at 1111.

Here, Plaintiff argues that Pioneer's reason for termination was pretextual based on the following alleged facts: 1) Plaintiff's position was not actually terminated as part of reorganization; 2) Plaintiff was more qualified than Arnold for the new Zone Director position; 3) one slide of a slide show presentation had the word "retire" next to Plaintiff's name; 4) Haga and Kendzora discussed Plaintiff's desire to retire when they discussed reorganization; 5) Haga expected Plaintiff to retire after his termination; 6) Haga inquired about Plaintiff's desire to retire in Florida; 7) Haga sent Plaintiff an email that described Plaintiff as a "human antique"; and 8) Kendzora's statement that Plaintiff would be "happy" with the result of his April 1, 2003 visit. (Pl.'s Opp'n at 2, 6-10). For the reasons discussed below, the Court finds that none of the alleged facts demonstrate that Pioneer's reason for termination was pretextual.

### i.  **Plaintiff's Position Was Terminated As Part of the Reorganization**

Plaintiff contends that his position as Zone Director was not actually eliminated as part of the reorganization. He argues that Arnold simply assumed Plaintiff's position as Zone Director in

April 2003. Plaintiff bases this assertion on the fact that Arnold uses his old office in Bloomfield, New Jersey, he services the same clientele, and supervises the same employees.

Plaintiff's contention is without merit. Although Arnold may physically occupy Plaintiff's old office and assumed many of Plaintiff's former responsibilities, Plaintiff cannot ignore certain undisputed facts: 1) that Zones 4 and 5 were combined and 2) a new Zone Director position was created specifically for the newly expanded zone. Additionally, Pioneer identifies evidence demonstrating that the Zone 4 office located in Massachusetts was closed and the overall headcount decreased from 108 to 100 as a result of the reorganization. (Simon Supp. Cert., Ex. A; Kendzora Dep. at 12:10-18). Thus, the Court finds sufficient evidence in the record establishing that Plaintiff's position was eliminated as part of the reorganization. Consequently, Plaintiff's contention must fail.

### ii. Plaintiff's Qualifications for the New Zone Director Position

Plaintiff next argues that he was equally or more qualified than Arnold for the new Zone Director position. Plaintiff alleges that Arnold did not have experience in supervising employees. In contrast, Plaintiff had three years experience in performing the duties of Zone Director. Plaintiff further asserts that Pioneer's own actions demonstrate that he was qualified for the job. Specifically, he notes that he was retained for six months as a consultant to assist Arnold in his new position. During this time, Plaintiff allegedly received a note from Haga asking that he train Arnold to become a "good Zone Director." (Pl.'s Opp'n at 8). Plaintiff argues that this demonstrates Plaintiff was qualified for the position.

The Court finds this insufficient to establish pretext. Although Plaintiff may have subjectively believed that he was more qualified for the new position, the evidence shows that

11

Plaintiff received low performance ratings and was perceived to be the weakest performer among the five Zone Directors. Pioneer adduced evidence demonstrating that the new Zone Director position entailed greater responsibilities than Plaintiff's former position as director for Zone 5 and naturally required a strong leader. (Kendzora Dep. at 13:8-15; 28:8-16). The evidence shows that Pioneer perceived Arnold as the better candidate, particularly in light of his strong performance as Key Account Manager. Plaintiff's mere disagreement with Pioneer's business decision is irrelevant for purposes of an NJLAD claim, and thus is insufficient to establish pretext. *See Peper v. Princeton Univ. Bd. of Trustees*, 389 A.2d 465, 481 (N.J. 1978) (noting that the purpose of judicial intervention in the context of private employment is not to make personnel decisions for the employer, but to ensure that an employer's personnel decision is not based on criteria proscribed by law).

Moreover, the fact that Pioneer asked Plaintiff to remain as a consultant in order to assist Arnold with the transition as new Zone Director is not evidence of pretext. The record indicates that Plaintiff was allowed to stay with the company until October 2003 as a courtesy for his many years of service at Pioneer. (Haga Dep. at 73:17-74:11). Further, Plaintiff was not instructed to train Arnold in his new position, but to assist him with the transition. (*Id.* at 76:11-13). The record shows that Arnold was originally situated in Denver, Colorado before transferring to New Jersey. (Haga Dep. at 86:7-8). Plaintiff was asked to familiarize Arnold with the geographic area of the new zone. In his deposition, Plaintiff testified that during his consulting period he would "work with [Arnold] and sit there and . . . help him, show him around things, be able to answer questions if they came up from customer service, and quite frankly, sen[d] out a resume or two or three or four." (Salkovitz Dep. at 101:15-20). Plaintiff remained on the payroll but only worked two days a week. This does

not suggest that Plaintiff was retained specifically to train Arnold as a Zone Director, nor does it demonstrate that Plaintiff was more qualified than Arnold for the position. Thus, Plaintiff's argument must fail.

### iii.     Plaintiff's Claims Regarding Retirement

Plaintiff alludes to several incidences that involve Plaintiff's retirement plans in an effort to demonstrate pretext. Specifically, Plaintiff points to: 1) one slide of a slide show presentation that contained the word "retire" next to Plaintiff's name; 2) Haga's admission that Plaintiff's retirement plans were discussed when reorganization decisions were being made; 3) Haga expected Plaintiff to retire after his termination; and 4) Haga's post-termination meeting inquiry as to Plaintiff's plans for retirement.

With regard to the slide, Plaintiff asserts that the placement of the word "retire" is evidence of pretext. Pioneer contends that the slide was prepared by Richard Hackett, Director of Strategic Marketing and Telemarketing Director at Pioneer. Pioneer asserts that Hackett made the independent decision to note "retire" next to those employees who had the "option of retiring instead of being terminated as a result of the elimination of their positions." (Certification of Richard Hackett, ¶ 3). The word "retire" appeared next to another employee's name, Jim Liddle, who was not chosen for termination. Plaintiff fails to convince this Court that this particular slide evinces age animus. The Court concludes that the mere fact that the word "retire" appeared next to Plaintiff's name on a slide, without more, is insufficient to support an inference of discrimination.

Further, Haga's admission that Plaintiff's retirement plans were mentioned, the fact that Haga expected Plaintiff to retire, and Haga's inquiry about Plaintiff's retirement plans also do not support

13

an inference of pretext or discredit Pioneer's proffered reason for termination. Plaintiff fails to identify evidence in the record demonstrating that these references to Plaintiff's retirement were anything other than a common topic of conversation among coworkers. In contrast, the evidence does show that for approximately two years, Plaintiff openly discussed his retirement plans with colleagues which involved building a house in Florida. (Salkovitz Dep. at 77:19-78:3; Kendzora Dep. at 22:15-18; 184:17-185:9; Boyer Dep. 7:16-19, Pl.'s Counterstatement, ¶ 51). Importantly, Plaintiff fails to establish that such comments were motivated by discriminatory intent based on age. The evidence does not indicate that these isolated references played any role in the decision to eliminate Plaintiff's position and to terminate his employment.

Instead, the evidence demonstrates that Plaintiff's substandard performance as a Zone Director, as opposed to his retirement plans, was crucial in Pioneer's decision not to select him for the new Zone Director position. The Court finds no evidence in the record to discredit Pioneer's belief that Plaintiff lacked the potential to contribute as the new Zone Director. Therefore, the Court rejects Plaintiff's argument that these inquiries into Plaintiff's retirement plans constitute evidence of pretext.

### iv. Haga's December 9, 2002 Email and Kendzora's Statement that Plaintiff Would be "Happy"

Next, Plaintiff argues that an email sent to Plaintiff from Haga on December 9, 2002 constitutes evidence of discriminatory intent. The email involved a picture of three Pioneer employees in front of a used car dealership called "Haga's Used Cars." (Simon Cert., Ex. L). The original message, written by Stephen Phillips (another member of HEC), mentioned that Haga created a new division for revenue growth called "Haga's Used Cars" or "HUC." Plaintiff forwarded

the email to Haga with the following note: "Mr. Haga, Thought you may want to see what kind of impression you are making after a short time as our leader. Enjoy!!!!!!" (*Id.*). Haga responded:

> Thanks for sending a nice picture, however, I prefer "HAD" = Haga's Antique Division[.] You can be a founding member, which means you are enough age [sic], and enough to be called "Human Antique." Hope you have [] good sales in December, too.

(*Id.*). Haga, who is the approximately the same age as Plaintiff, testified that his comments were intended as a joke. (Haga Dep. at 119:22-23).

The Third Circuit has articulated that isolated comments or "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992); *but see Grasso v. W. N.Y. Bd. of Educ.*, 834 A.2d 1026, 1032 (N.J. Super. Ct. App. Div. 2003) (noting that remarks made by one involved in the decision-making process may not be considered stray remarks). Generally, "off-hand comments of a joking nature are rarely considered to create sufficient doubt so as to raise an inference of intentional discrimination." *Perry v. Prudential-Bache Secs., Inc.*, 738 F. Supp. 843, 853 n.5 (D.N.J. 1989).

Here, the Court concludes that this email lacks sufficient evidentiary value to discredit Pioneer's legitimate, nondiscriminatory reason for his termination. The email by itself appears to have no relation with the decision to terminate Plaintiff as a result of the reorganization. Moreover, Plaintiff admits that Haga's reference to him as an "antique" was an isolated incident. (Salkovitz Dep. at 88:16-25). Plaintiff further admits that he was not offended by the email when he received it, but construed it as a lighthearted joke. (*Id.* at 92:20-93:21). The Court finds no other evidence

in the record to support the conclusion that he was subjected to other insults or remarks that evinces discriminatory intent. Therefore, Plaintiff's argument that the December 9, 2002 email is evidence of pretext must fail.

Plaintiff also briefly references an alleged statement made by Kendzora as evidence of discriminatory intent. In particular, Plaintiff argues that Kendzora advised Plaintiff over the telephone that he would be "happy" after his visit April 1, 2003. (Pl.'s Opp'n at 3). Plaintiff fails to provide this Court with any factual or legal support for his conclusion that this alleged statement establishes pretext. The Court finds Plaintiff's argument to be tenuous at best, and therefore must be rejected. Accordingly, the Court finds that Plaintiff fails to bring forth sufficient evidence that would lead a reasonable factfinder to conclude that Pioneer's articulated legitimate reason was pretextual.

### v. **Plaintiff Has Not Produced Direct Evidence of Discrimination**

Plaintiff further argues that the aforementioned incidences involving inquiries about Plaintiff's retirement, the slide show, the December 9, 2002 e-mail, and Kendzora's statement all serve as direct evidence of discrimination. In order to prove discrimination under NJLAD by direct evidence, "the quality of evidence required to survive a motion for summary judgment is that which if believed, proves the existence of a fact in issue *without inference or presumption*." *Bergen Commercial Bank v. Sisler*, 723 A.2d 944, 954 (N.J. 1999) (quotations and citation omitted) (emphasis in original). Importantly, the evidence must demonstrate, "not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision." *Id.*

The Court concludes that the evidence presented by Plaintiff fails to meet this stringent

requirement. Plaintiff argues that the evidence, when viewed in the temporal and personal context, serve as direct evidence of age-based animus. The Court disagrees. The evidence does not demonstrate that Pioneer harbored any hostility or discriminatory animus over Plaintiff because of his age. As discussed above, Plaintiff fails to prove that these instances had any bearing on Pioneer's decision to terminate Plaintiff.

Plaintiff cites *Fakete v. Aetna*, 308 F.3d 335 (3d Cir. 2002), in support of his assertion that he has presented direct evidence of discrimination. In *Fakete*, the Third Circuit concluded that the plaintiff, Fakete, introduced evidence of direct discrimination sufficient to withstand summary judgment. In particular, Fakete introduced evidence that his supervisor, Larkin, stated that he was "looking for younger single people" and consequently, Fakete would not be happy at the company in the future. *Id.* at 339.

The Court finds Plaintiff's reliance on *Fakete* to be misplaced. As the Third Circuit noted, Larkin's statement was in direct response to the plaintiff's inquiry about his future at the company. The conversation took place in the context of a serious conversation with his supervisor. The court concluded that in this context, "a reasonable jury could find that Larkin's statement was a clear, direct warning to Fakete that he was too old to work for Larkin, and that he would be fired soon if he did not leave Aetna on his own initiative." *Id.*

The Court finds Plaintiff's situation to be markedly different. This evidence fails to reflect a discriminatory or retaliatory animus toward Plaintiff. He has not presented evidence that Haga or Kendzora desired to replace Plaintiff with a younger employee, or that his age played a role in the decision to terminate him. The evidence demonstrates that references to Plaintiff's retirement plans, the December 9, 2002 email, and Kendzora's statement that he would be "happy" were not causally

17

connected to Pioneer's decision to terminate him. Thus, such evidence cannot constitute direct evidence of discrimination.

Accordingly, the Court rejects Plaintiff's argument that evidence of direct discrimination must preclude summary judgment. Therefore, the Court grants Pioneer's motion for summary judgment because there is no genuine issue of material fact with regard to Plaintiff's NJLAD claim.

### 3. **Punitive Damages**

Pioneer also moves for summary judgment as to Plaintiff's claim for punitive damages. Having concluded that Plaintiff's NJLAD claim must be dismissed, the Court grants summary judgment in favor of Pioneer as to this issue.

### III.   CONCLUSION

For the foregoing reasons, Pioneer's motion for summary judgment is granted, and Plaintiff's Complaint is dismissed in its entirety. An appropriate form of order accompanies this Memorandum Opinion.


Dated:       June 30, 2005


                                                                 s/ Garrett E. Brown, Jr.
                                                            GARRETT E. BROWN, JR., U.S.D.J.